CHESTER W. TAWNEY ET AL. *v.* MUTUAL SYSTEM OF MARYLAND, INC. ET AL

[No. 137, October Term, 1945.]

*Decided May 17, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Hilary W. Gans* and *Leon H. A. Pierson,* with whom was *John L. Sanford* on the brief, for the appellants.

*Leo M. Alpert,* with whom were *Reuben Shiling* and *Makover & Kartman* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

The Mutual System of Maryland, Inc., a small loan company, and Management Service, Inc., a holding company, filed a bill for an injunction and accounting against Chester W. Tawney, Marian V. Brewer, and others, in the

Circuit Court of Baltimore City. The bill alleged that the respondent, Tawney, on January 30, 1941, and the respondent, Brewer, on May 11, 1942, entered into employment contracts with the complainants, whereby the employees agreed: (J) to keep secret the names of or any information relative to any past, present or prospective borrowers from and customers of their employers; (K) to refrain from using any information relative to such borrowers and customers and not to persuade any such borrowers or customers to do anything that might be to the disadvantage of their employers; (L) to so keep secret and to so refrain for a period of three years from the date of termination of the employment; and (M) to refrain from engaging directly or indirectly in any business competitive with that of their employers in the Baltimore City trading area for a period of two years from the date of termination of the employment. The contracts were on printed forms and of indefinite duration; each contained a clause (Q) permitting termination by either party upon five days written notice, and a severability clause (R). The bill alleged that Tawney, who was employed as manager of Mutual, and Brewer, who was employed as cashier, resigned in June, 1945,, and immediately engaged in a competing business under the style of The Tawney Loan Service, Inc., and that they systematically solicited borrowers and customers of Mutual, making use of the confidential information gained from their previous employment.

After preliminary proceedings that need not be detailed, answers were filed and after extended hearings the court passed a decree, I. dismissing the bill as to the respondents DeMarco and Hundertmark, II. (a) enjoining Tawney and Brewer from engaging, whether as principals, co-partners, officers, employers or employees, directly or indirectly, in the small loan business (as defined in Art. 58A of the Code) in the trading area of Baltimore City (including defined suburban areas in Baltimore and Howard Counties) for a period of two years from June 8, 1945, as to Tawney, and June 16, 1945, as to

Brewer; (b) enjoining the respondents (1) from using or causing to be used or divulging or causing to be divulged the names of, or any other information relative to any past, present or prospective (in the sense that the same were on any list of prospects existing as of June 2, 1945) security holders or borrowers or business customers or associates of Mutual, in so far as such knowledge and information were acquired during their employment by Mutual, and (2) from using or causing to he used any papers, records or other information relative to the matters set forth in Section (1) hereof; and (3) from engaging or taking any part, in any endeavor to persuade any of the borrowers or customers of Mutual or Management to discontinue their accounts with Mutual for a period of three years accounting from June 8, 1945, as to Towney, and from June 16, 1945, as to Brewer; III. enjoining The Tawney Loan Service, Inc. (a) from participating with Tawney and Brewer in the small loan business (as defined) within the area and for the time stated, and (b) from interfering with the operation of the contracts of employment between Tawney and Brewer on the one hand and Mutual and Management on the other; and IV. requiring Tawney, Brewer and The Tawney Loan Service, Inc., to account to Mutual for business and profits if any, solicited or procured from the customers of Mutual and damages, if any, arising out of loss of profits to Mutual, to which end the cause was referred to a standing auditor. From that decree the appeal to this Court was taken.

There is little dispute as to the facts. Prior to his employment by Mutual, Tawney, a native of Maryland, had been engaged in the small loan business in Baltimore, first with Household Finance Co., for about six years, and later with Lincoln Loan Service, Inc., as manager, for about three years. He had graduated from the School ot Business Administration, University of Maryland, in 1931. In December, 1940, he wrote to Fred H. Lovegrove, President of Management Service, Inc., which operated a national chain of loan companies, applying for the posi-

tion of manager of its new Maryland branch, and obtained the position at a salary of $225. per month, the same amount he had been getting as manager of Lincoln. The respondent, Brewer, was cashier of Lincoln Loan Service, Inc., and came with Mutual in a similar capacity shortly after the new branch was opened. All of her previous experience had been in the small loan business. The record does not disclose the amount of her salary. There was testimony that Tawney brought with him from Lincoln a list of its customers, and solicited them by letter, and by advertisement. Lovegrove denied knowledge of the solicitation in the first instance, and claimed to have objected to it when brought to his attention; however, it was stated by Tawney that in the first three months after the office opened, $72,000 in loans was put on its books, $12,000 of which came from the purchase of Bankert Loan Service, and the remainder from former customers of Lincoln. When Tawney and Brewer left the employ of Mutual there were about 200 former borrowers of Lincoln on its books.

There was no dispute of the fact that Tawney and Brewer each signed the contracts relied on, although Tawney testified that his contract was signed several months after its date and after he began to work for Mutual. Their resignations relied upon clause (Q) therein permitting termination by either party upon five days notice. We see no force in the contention that the covenants were not ancillary to the employment; the weight of the evidence supports the conclusion that the execution of contracts containing such covenants was a prerequisite of the employment in each case. Likewise, we see no force in the contention that there was a want of consideration or that the consideration was inadequate, even if the latter inquiry were open.

Much of the testimony revolved around a contention by Tawney that Lovegrove knew that he had solicited Lincoln accounts, apparently upon the doctrine of "unclean hands" to raise an equitable estoppel. But it was not shown that there was any contract between Tawney and

Lincoln, and we find no basis for the application of that doctrine in this case. Compare *Bennett v. Westfall,* 186 Md. 46 A. 2d. 358, 361. It is not disputed that Mutual purchased not only Bankert's Small Loan Service, at a cost of $14,032, but also 257 accounts from Fidelity Acceptance Corporation for $23,632, People's Loan Service, Inc., for $11,476, St. Paul Finance for $23,216, County Finance Corporation for $27,244, 80 accounts from the Globe Finance Co. for $10,707, Major Loan Service for $35,763, and Fidelity Acceptance Corporation for $67,000. All of these purchase contracts contained restrictive covenants against engaging in business or soliciting patronage for five years. There was also testimony that patronage was attracted in some instances by a reduction in interest rates below the maximum allowed by law.

Tawney was the sole manager of Mutual; Mrs. Brewer was the sole cashier. As such, they were the principal points of contact between Mutual and its customers. Although Tawney was receiving $275 a month in salary and seemed on good terms with his employer, in April, 1945, he laid plans to go into business for himself, with the financial backing of Hundertmark and DeMarco. In May, he negotiated a lease at a location only two blocks from Mutual's office, and arranged for telephone service. A few weeks later he, Mrs. Brewer and DeMarco executed a certificate of incorporation of The Tawney Loan Service, Inc. On June 1, he obtained a license, and on the following day tendered his resignation. Mrs. Brewer resigned a week later. From June 19, 1945, through July 10, 1945, when a temporary restraining order became effective, 101 open accounts of Mutual customers, totaling $18,994.99, were paid off by The Tawney Loan Service, Inc. Of these, 38, totaling $6,963.47, had been originally acquired by Mutual through purchase of other small loan companies. Tawney denied active solicitation of the customers of Mutual, except in some instances where the customers had previously been customers of Lincoln, but it was admitted that both he and Mrs. Brewer telephoned and wrote customers to get their business, on an exten-

sive scale. He admitted telling whomever he saw that he was in business for himself, and offering to refinance them. A number of witnesses testified that they were solicited by Tawney, even though they first met him at Mutual. The appellants' counsel concede in their brief that "some customers" were diverted.

The appellants contend (1) that the restrictive covenants contained in the employment contracts are against public policy and invalid, and (2) that if the covenants are valid in part, the appellees are entitled only to such relief as is necessary for the protection of their business.

The Restatement, Contracts, Sec. 514, declares that "a bargain in restraint of trade is illegal if the restraint is unreasonable." Sec. 515 declares that "a restraint of trade is unreasonable * * * if it (a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or (b) imposes undue hardships upon the person restricted, or * * * (e) is based on a promise to refrain from competition and is not ancillary * * * to an existing employment or contract of employment." Conversely, Sec. 516 (f) declares that a bargain not to compete "within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent," is reasonable.

In Comment on clause (b) it is said: "No identical test of reasonableness applies to bargains for transfer of land or goods or of a business, on the one hand, and to bargains for employment on the other. The elements that much be considered in order to determine reasonableness differ in the two cases, especially where the employment is of a specialized character, and familiarity and skill in it are assets of the employee. Limitations of his use of these assets are less readily supported than limitations on the use of property or in carrying on a business." A comment upon clause (f) declares: "(h) a promise of a former employee will not ordinarily be enforced so as to preclude him from exercising skill and knowledge acquired in his employer's business, even if the competition is in-

jurious to the latter, except so far as to prevent the use of trade secrets or lists of customers, or unless the services of the employee are of a unique character."

In 5 Williston, Contracts, Rev. Ed. Sec. 1643, the learned author states: "Courts are less disposed to sustain an agreement which forms part of a contract of employment to refrain from subsequently engaging in competitive occupation than where a similar agreement is attached to a contract of sale. There is likely to be greater hardship to the promisor and therefore injury to the public, in the former case, as for instance where an employee, expert in a narrow and technical specialty, engages not to practice his specialty * * * The distinction, however, seems unadvisable as a positive rule of law. * * * The ultimate question should be the same in both cases—what is necessary for the protection of the promisee's rights and is not injurious to the public. * * * While there is a conflict as to whether a restrictive covenant is enforcable in a contract termination at will, the prevailing view is that the covenant is valid if a period of notice is stipulated for. The authorities are in conflict with respect to the enforcibility of such a restrictive covenant on default by the employer."

The elements to be considered are thus stated in *May v. Young*, 125 Conn. 1, 2 A. 2d. 385, 387, 119 A. L. R. 1450: "of the principal considerations affecting the validity of restrictive covenants on grounds of public policy, one is injury to the public by being deprived of the restricted party's industry or services; the other the injury to the party himself by being precluded from pursuing his occupation and thus being prevented from supporting himself and family. 'But if neither of these evils ensue and if the contract is founded on a valid consideration and a reasonable ground of benefit to the other party, it is free from objection, and may be enforced.' *Oregon Steam Navigation Co. v. Winsor*, 20 Wall, 64, 87 U. S. 64, 68, 22 L. Ed. 315." In the application of these principles to the facts of each case, however, the courts are not in agreement.

In *New England Tree Expert Co. v. Russell*, 1940, 306, Mass. 504, 28 N. E. 2d 997, the court sustained an injunction restraining an employee from engaging in a competing business throughout the territory where the employer did business. This territory was more extensive than that which had been actually canvassed by the employee, although less extensive than the territory (the whole New England states) specified in the contract. This decision was supported in a note, 16 Notre Dame L. 135, but criticized in a note, 26 Cornell L. Q. 707. It was followed in *Saltman v. Smith*, 1943, 313 Mass. 135, 46 N. E. 2d. 550. On the other hand, in *Samuel Stores, Inc., v. Abrams*, 94 Conn. 248, 108 A. 541, 9 A. L. R. 1456; a restriction applicable to solicitation of trade from other stores in a chain was held invalid, and it was intimated that only a restriction of solicitation of actual customers would be sustained. However, in the later case of *Torrington Creamery v. Davenport*, 1940, 126 Conn. 515, 12 A. 2d. 780, the Samuel Stores case was distinguished, and a restriction of competition in the two towns served by the creamery where the employee worked was held reasonable. See also *May v. Young, supra*. In *Kadis v. Britt*, 1944, 224 N. C. 154, 29 S. E. 2d. 543, 152 A. L. R. 405, a restriction against delivery man and bill collector for a retail clothing store was held unenforcible as imposing undue hardship, although in *Moskin Bros. v. Swartzberg*, 1930, 199, N. C. 539, 155 S. E. 154, the local manager of a retail clothing store had been enjoined from entering into competition in stated territory within two years after termination of his employment. See also *Comfort Spring Corporation v. Burroughs*, 1940, 217 N. C. 658, 9 S. E. 2d. 473. The New York courts have uniformly declined to enforce restrictive covenants except as to active solicitation. *Clark Paper and Mfg. Co. v. Stenacher*, 236 N. Y. 312, 140 N. E. 708; *Molina v. Barany*, Sup., 56 N. Y. S. 2d. 124. In *Hydraulic Press Mfg. Co. v. Lake Erie Eng. Corp.*, 2 Cir., 1942, 132 F. 2d 403; it was held that a covenant by an engineer employed as a draftsman, not to engage in competition in the United

States within one year was unenforcible. In *Roy v. Bolduc*, 1943, 140 Me. 103, 34 A. 2d. 479, 149 A. L. R. 630, a covenant by a real estate salesman not to work for a competing firm was held unenforcible. In *Briggs v. Butler*, 1942, 71 Ohio App. 48, 47 N. E. 2d. 812, a covenant by an advertising solicitor was held unenforcible, upon the strength of the comment in the Restatement. But this decision was reversed by the Supreme Court of Ohio, 140 Ohio St. 499, 45 N. E. 2d 757, stress being laid upon the unusual nature of the services. In *Eigelbach v. Boone Loan & Inv. Co.*, 1926, 216 Ky. 69, 287 S. W. 225, the manager of a loan company was enjoined from engaging the same line of business in the City of Louisville for a period of one year.

In *Dyar Sales & Machinery Co. v. Bleiler*, 1934, 106 Vt. 425, 175 A. 27, a salesman of road machinery, under a contract terminable upon seven days notice, was enjoined from entering into competition for one year, in State of Vermont. But in *Standard Oil Co. v. Bertelsen*, 1932, 186 Minn. 483, 243 N. W. 701, it was held that a covenant by the operator of a bulk oil station, not to engage in competition for one year in the village of Buffalo Lake and surrounding territory, was unenforcible. The court remarked that the employee was simply an ordinary workman, and did not acquire or occupy any confidential or close relations with plaintiff's customers. It also stressed the fact that to require the employee to change his occupation or move to another community would be a harsh burden. In *McCluer v. Super Maid Cook-Ware Corporation*, 10 Cir., 1932, 62 F. 2d 426, a covenant by a salesman of aluminum ware not to engage in competition, in the territory he had covered, for one year, was held unenforcible.

With this background, we turn to the Maryland authorities. In *Rosenstein v. Zentz*, 118 Md. 564, 85 A. 675, a piano salesman, covering the territory of Maryland, Virginia, and the District of Columbia, agreed to work for an employer for one year at a salary of $15 a week, and during that period not to work for anyone in a simi-

lar business within the territory. Injunctive relief was denied on the ground that the services were not unique and extraordinary. In *Deuerling v. City Baking Co.*, 155 Md. 280, 141 A. 542, 544, a covenant by a driver-salesman for a bakery company, not to solicit or sell products similar to those of the baking company, for three months after termination of his employment from week to week, in any territory covered by the employee during the last six months of his employment, was enforced. The court remarked that "in cases where the employment necessitated that the employee have a special individual qualification, or [where] the service was of an unusual and unique character," it was generally recognized that the breach of covenant should be enjoined. The court also said (155 Md. at page 287, 141 A. at page 544) : "The question whether (the covenant) is reasonable depends upon circumstances, the more important of which are: Is the purpose to be obtained a fair and conscionable one; will it do greater harm to the employee than good to the employer; and, if it is reasonable as between the parties, does it so injuriously affect the public as to make it void as against public policy?" It was pointed out that the driver's personal contact with the customers, rather than the quality of the product, was the chief sales inducement, and that the interval of three months was no more than sufficient to enable a new employee to become acquainted with the customers. The court further said: "Neither do we think that its terms are harsh, or impose any hardship upon the employee which outweighs the protection to which the employer is entitled. It does not restrict him from entering the employ of any other bakery company immediately upon his leaving the appellee, nor does it restrict him from engaging in the sale of bakery products for himself or future employer over any area other than the comparatively small territory described in the contract, and not over that except for the short period of three months." The court distinguished *Rosenstein v. Zentz, supra,* both on the ground that the covenant in

that case did not extend beyond the duration of employment, and that the services were not extraordinary or unique and required no skill or talent of a particular kind. The court quoted *Colonial Laundries, Inc. v. Henry,* 48 R. I. 332, 338, 138 A. 47, where it was said that in the case of the ordinary traveling salesman "the list of people upon whom he calls has no market value, apart from a general good opinion of the employer's methods and goods and prices. A particular laundry route has a definite market sale value." Compare *Fulton Grand Laundry v. Johnson,* 140 Md. 359, 117 A. 753, 23 A. L. R. 420; and *Burnham v. Burnham,* 154 Md. 349, 140 A. 361.

In *Tolman Laundry v. Walker,* 171 Md. 7, 187 A. 836, 837, this Court sustained a covenant not to call upon former customers upon a certain laundry route, embracing certain parts of the District of Columbia and Maryland, for one year after termination of his employment. The Court said: "These routes are well defined and present and prospective patrons are listed and classified or solicited by the laundry with reference to the particular route by which they are or will be accommodated." In *Western Maryland Dairy v. Chenowith,* 180 Md. 236, 23 A. 2d 660, a covenant not to solicit or sell, to those customers of the Dairy whom he had served during the last six months of his employment, for six months after termination of employment, was sustained. In the latter case the Court also held that an accounting should be had for profits made through the unlawful conduct of the former employee in pirating customers.

It would therefore appear that this Court, in cases of this type, has never passed upon the validity of a restriction against competition in an employment contract, except in cases of bakery, laundry or milk routes, and even there the relief has been directed against solicitation of existing customers, rather than competition as such. It is true that Tawney appears to have acquired a following or clientele, who would doubtless prefer to trade with him personally, regardless of the particular company he worked for. But this would be true in some

degree of any salesman, or of any cashier. We think the route cases are distinguishable, for while the route is defined in terms of area, exclusion from that area is only a means of preventing use of the lists of customers.

In the case at bar it is sought to enforce a restriction beyond the time when new employees might reasonably become acquainted with existing customers, and apply it to the whole trading area of Baltimore and environs, wherein there are several hundred thousand people with whom the employer has no contact whatever, and to a business where the occasional financial need of the customer, rather than the recurrent calls of the supplier, is the prime incentive. We think this goes beyond what is necessary to protect the good will of the employer, and works an undue hardship upon the employees, who would be excluded from engaging in the business for which they are specially fitted by long training and experience. Moreover the effect of enforcing the clause (M) would be to stifle competition, in a field where the existence of competition is clearly in the public interest.

We think, however, that the covenants contained in clauses (J), (K) and (L) of the contracts, are severable and enforceable in terms. The relief should not exceed what is there called for, because such covenants must be strictly construed. We shall therefore remand the case in order that the decree may be modified so as to enforce the covenants contained in clauses (J), (K) and (L) of the contracts, but not clause (M). We sustain that portion of the decree that directs an accounting. Paragraph III of the decree, applicable to the Tawney Loan Service, Inc., should be omitted.

> *Decree affirmed in part, reversed in part, and case remanded for the passage of a decree in conformity with this opinion; costs to be divided.*